More yoners. May it please the court. Brett Persher, appearing on behalf of the appellant, Tyler McDonald. Yoners, fundamentally I think this is a case dealing with the protections of the Fourth Amendment because that's where we really start with as respect to whether or not Mr. McDonald had a reasonable expectation of privacy in the Diaz residence and if in fact you do find that he did have that then I believe respectfully that the trial court erred in granting summary judgment because that's where this case really rises and falls. What do you think are his best cases for this proposition of privacy of the visitor, the casual visitor? Your Honor, I think what in that respect I think you have to take a look at the kind of the the progeny of the cases the Supreme Court has talked about and in taking a look at those and getting up to the the Olson case and then also the Carter case because those those two most recent Supreme Court cases and really they're not that recent any longer but they talk about I think maybe a framework of which to work from. In the Olson case, which was a criminal case, not particularly unlike this case in the scenario in the sense of it was a person who was on the run, was hiding out, and the Supreme Court found that the person was living there although he was wanted for murder and whatnot and was doing some other acts to try to keep from being located. The court said that in that particular case, because he is an overnight guest, that he does have a reason. Wait, this person is just visiting. I understand that and I'm getting there. So he's not an overnight guest, so that doesn't quite get us there. He's not, but when you take a look at the Carter case, the Carter case talks about well we have, it's not an overnight guest, but these people are not there for purposes of what we see as a social context. They're here for purposes of who says himself, right? That I went there to basically flee the police. There's no question and I agree with that. I mean I agree with that 100% because that's indeed what he was doing. But we take a look at it, it's a two-part test. It's a subjective expectation of privacy. Did he subjectively believe that he'd be safe there in the Diaz residence? There's no question. He would not have gone there but for believing that he'd be safe. The next question is would society recognize that safety within the home of a friend? This is not a situation. But okay, I grant you it's his friend's home, but I don't, I mean Carter seems so close in terms of someone, I mean in fact your client was at this, at the Diaz residence even less time than the folks who were there. True. Carter and he was there for, wouldn't you characterize it as an illicit purpose? Well I don't think it's any more illicit than the person was in Olson. I mean I don't think it's, I think there's no difference between the two. But no more, it's just as illicit as the purpose in Carter, that's my point. Well I don't believe so. I mean he was, he was definitely was, was seeking refuge in a friend's home. The circumstances, he was, he was leaving his parents home. And I think that's when we start to bring in the other facts of the case, what the circumstances were. This was a situation to where his parents, his stepfather actually calls 911 because they are concerned that their son is suicidal. That's the reason they called. They did not call because they were concerned that he was going to break the law or that he was going to commit a crime. They were concerned because of the, of the emotional disturbance. That was the issue. Right, but his concern is that he knows that he's wanted. Was there a warrant? Well that, Judge, that's, that's a great question because there is, there was a concern that there might, might be a warrant. Might. Possible. Not that there was. He was a suspect in a shooting. Right. There wasn't a basis of saying probable cause. And the city says, well there was probable cause to arrest. That I think is a question of fact to be determined by the prior fact. And also that there was, there was, they say that there was a PC arresting for DV burglary. That's not what the call was. And the DV burglar, we're talking about the parents call, that's not what the call was. It was, it was basically, it was a, a, a safety call is what it was. And the police with their own determination, well this is a DV burglar. Well, respectfully, it's probably a glorified trespass is what it is. Which is, which is not a basis in which to go forward. So with that, with that background, we have a situation where we have an individual that doesn't want to be contacted by police clearly. He is emotionally disturbed, no question. And there's no suggestion of anything but that. He goes to his, a friend's place of refuge. And that's where he went to the DDOT's residence. It is not, and you take a look at the, the Carter case is why I think it's destructive. You take a look at the concurring opinions. The Kennedy opinion is what I cite. Because it's frankly, it's spot on. Because in the sense saying that any person who goes to a friend's residence is going to have an expectation of privacy. That, that the social host can allow or disallow people to enter the home. Well, that's exactly what Tyler believed. Because that's why he went to the DDOT's residence. It would be no different than if, if Ms. Holman, who is a friend of mine, came to my home for dinner. And then there was a person that she didn't want to have seen, be in there. She could say, please don't let that person in. If it was her decision, I could say, you're not coming in. The EI's didn't have that, that ability because he was pulled out at gunpoint. And there was no consent at that. And the officer basically went right through that. There was, there was no issue with respect to whether or not the officer was going to go in. But in this particular case, taking a look at the, at the Carter case and, and Justice Kennedy says, that's really not the issue before us. Because that's not what was, what was argued. But, but Justice Kennedy, Justice Ginsberg in her dissent, they talk about the idea that, that it is a place of refuge. It's a place, if you are a social host, you're a guest. And when you are a guest at somebody's home, it doesn't matter if you're spending the night or not. That's, that's an artificial line. There, there's... So let, let's say that he does have an expectation of privacy. We'll put him in the same position as the homeowner, in effect. But then we have these exceptions to the warrantless entry, the probable cause plus exigent circumstances or the separate one of emergency situation to protect either someone in the home or the officer. Correct. Right. So why wouldn't this fall under, at a minimum, the exigent because of the probable cause on the arrest and the concern about what's going on there in and the toddler and the whole kind of milieu that he, that, that the police run into? Well, I would suggest the milieu is because of what the police officer did. I respectfully, and the reason I say that is because the time, and that's why the time we put in my brief, the whole time span was three minutes between call and, and the end of the, of the, the shots fired. By the time that the officer gets there to the, to the Diaz residence, it's, it's less than a minute between the time of him arriving or entering the home and shouting fire. It is very, very quick. All right. Extremely rapid. There, there isn't the exigent circumstances. Respectfully, I would urge that is a question of fact. That is not something that, that the judge could make in determination in this particular case. So are you, in effect, arguing the sort of danger creation by the officer? No question. Absolutely. Absolutely. The danger creation by the officer. And if you take a look at the case I cited, Espinoza, Glenn, the most recent case that, that I cited, Alexander, that whole, that whole litany of cases, they talk about if you provoke the need to use deadly force, then, then, then you can't just say, well, it was reasonable in that circumstance. Provided that the provocation itself amounted to an independent court amendment violation. Exactly. Exactly. And getting back to the exigent circumstances, the city wants to say, well, this was a hostage case. This was not a hostage case. There was nothing to suggest this was a hostage case. The only thing that suggests it was a hostage case is several months later in a declaration that the officer files, says, well, I thought this was a hostage case. And, well, that's not what the circumstances were at that point in time. So how, how would we analyze it? We're, we're kind of focusing now on the substantive Fourth Amendment violation, but given that we don't really have a case, you know, we might think Carter actually is against you, but you know, I think some of Kennedy's language and other in Carter actually helps you. Absolutely. But that's concurring language. It is. Correct? So my question then would be with respect to 1983 and qualified immunity, where would that leave you where you don't have a slam dunk case that says he has an expectation of privacy? Well, I think that there is, I think that there are those cases. I mean, I think you take a look at the, at the cases that predate this, the shooting, which is 2009, the Alexander case predates it there, where there's the, there's these different category of, of quote, residents of the homes where they're at. They're, they're there by way of friends. They're not residents in the sense that they leased the residence. That's some of the arguments that they will not lease homes. He's not an overnight guest. He's not. So what, what is the case that would say to the officer, 2009, this is, this is? Well, I think that it's, it's the, the general. Well, I think you got to back up a bit. Okay. And the reason I say that is that he had no idea if, if McDonald's there in the first place. Zero. He said it was best a 50-50 proposition that McDonald's there. He, when he, when he first runs the plate, the DIAJ plates. Yeah, but before he enters, he's talked to DIAJ. He did, at that point he did, he did say Tyler was there, so he had that knowledge of that that point in time. He knows he's there. He knows he doesn't live there. But. Well, I don't, he, he didn't know that, that he didn't live there. That's the whole point. There's facts that are missing. He did not know if he lived there or not. He knew that he was there. And so I think if you take, if you consider the facts in the light most favorable to McDonald, which, which we're required to do, then there was a, there has to be understanding that he didn't have a, a basis to go in there. He had no arrest warrant. We know that. He wasn't in hot pursuit or fresh pursuit. There wasn't an emergency. He didn't know he was there until he goes there to see and talks to DIAJ. Yeah, but let's just say, for purposes of argument, that we don't buy your Fourth Amendment unreasonable search argument, right? Do you, you do have a freestanding excessive force claim, don't you? We do. We do. The, the problem. Well, the problem, Judge, is this, is that if he comes in there and then, and McDonald, you know, if, if you take the facts in favor of that, so there is an excessive force claim there. The counter argument that you're going to hear in minutes is that they, when they have this, it's not 20-20 hindsight. It's, it's at that point in time. Yeah, no, no. Well, you'll have plenty of time. You're running low on time. So let me hear your best argument for why, if we just focus on the excessive force claim, why aren't there disputed issues of fact as to whether the officer reasonably perceived that his life was in danger? There are disputed issues of fact because the officer told McDonald to show me your hands. Officer O'Rourke, or Olson, one of the individuals out there, says that he hears him yelling, show me your hands, show me your hands, and almost instantaneously, he hears rapid shots fired. Well, you can't have it both ways. You can't say, show me your hands, and Tyler says, I was bringing my hands up, and he shoots me. All right, that is issues of fact for a jury to decide. Well, he's bringing his hands up, and there's an object in there. Now, the officer views it as a threat or a risk. We know it's a billful now, but there's something in his hands. There is. And it's black, I guess, or dark. It is, and it's dark in there. There's a whole series of reasons the officer shouldn't have been in there, but it's because of the lighting and the whole nine yards. But you're right, Judge. So let's take that in the most favorable to him, that he raises his hand as an object in his hands. Is not the officer, at that point, permitted to make a split-second judgment? He doesn't have to know it's a gun if a reasonable officer would perceive it as a threat. The answer is yes, if, in fact, what the officer says occurred, occurred. But that's not what McDonald says occurred. McDonald says he was bringing his hands up, and the officer shoots him. Well, can you just... I read the deposition, and he's doing something with his hands. Can you reenact what he said? He's saying that he's bringing his hands up and trying to go to the ground. And the reason he said that is because he'd been arrested before, so he knew what the drill was. And he's bringing his hands up, and the guy shoots him. Bringing his hands up. You're going like this. I'm sorry. He said he's bringing his hands up. He never got them up. He said the guy's screaming at him, which we will accept as true. And it's not unlike the other case you see here where, in the Glenn case in particular, that everybody's screaming at the poor kid, and they blast him. You know, that's the circumstance, and I think that's reasonable to expect the thoughts was going on at the time. And you know that from Officer O'Rourke, that he's hearing the yelling going on there as well. So in that particular scenario, we would urge that that is a question of fact for the trier fact. It is not something that can be decided as summary judgment, and we respectfully urge that, Judge Layden, Eric, I want to save my last minute. May it please the court. Jean Homan on behalf of the city of Tacoma and Sergeant Darren Kelly. The court is right. If this case rises and falls on whether or not Tyler McDonald had a reasonable expectation of privacy in Andy Diaz's home, this case falls. That's not a material question of fact. There are no facts in dispute. I don't agree with that. I mean, he has two separate independent claims, right? I'm talking only about the warrantless entry claim. Plaintiff characterized this as the case rises and falls on whether or not the entry into the home violated Tyler McDonald's Fourth Amendment privacy rights in the home itself. It didn't. The court is right. But then he has a separate excessive force claim. And I will address the separate excessive force claim. The court's analysis in Carter is dispositive. In the briefing, the plaintiff argues the overnight guest should not be a bright line rule. That's really not the point. The point that the court made in Carter is that if there is going to be a recognized expectation of privacy in addition to the individual's subjective belief, and we will accept that Mr. McDonald believed that that was an olly olly oxen free safe place, there must be a reasonable expectation. And that's where the claim falls apart, because that reasonable expectation must be either based on possessory or property interests that are given rise under state law, or must come from understandings that are recognized and permitted by society. There is no case law and no authority for the proposition that if you run to a place that you think will be safe for the purposes of evading police. Well, let me stop you there. OK. If, change the facts, there's no 911 call from the parents, right? Right. So there's no fleeing from the police, so to speak. OK. But Mr. McDonald is very distraught. He goes to Mr. Diaz's house as a trusted friend to get advice. And they're sitting in the living room, and then everything happens, just as it otherwise did. Would you say there that he had a reasonable expectation of privacy? If he was just merely on the premises with the owner's permission, no. Not under the court's analysis in Carter. The Carter analysis didn't rise and fall on the fact that the individuals were there for a business purpose. It was they were merely present on the property with the owner's permission. I can go to everyone's house, but that doesn't give me an independent right to assert on my own in a privacy interest in their home. Why don't you just, as in Olson the court said, the social guest essentially gets the benefit of the homeowners, the right to exclude people and whatnot. Why wouldn't you, as a social guest, you've gone to this trusted friend's house to get advice. You're in a very emotionally distraught state. Why wouldn't you get the benefit of? Because the expectation of privacy in the home is an individual interest. It doesn't belong to Mr. McDonald. Not under state law and not under any recognized norm. The court has said indicia of ownership is what gets you over that line to the expectation of privacy. At least in our society, when a trusted friend invites you into their home, let's say for purposes of giving you advice and how to work through a very emotionally challenging situation, I mean, you don't think it's reasonable that you feel like I'm in a place where I can trust that the owner of the house is going to exclude any unwanted folks from intruding? The court in Carter said that that expectation is reasonable in the context of the overnight guest. Because when we are traveling, when we don't have access to our own home, then we are expected, when staying, essentially living at a different place, that those same rights would carry with us. What did Sergeant Kelly, what did Kelly know about McDonald's relationship with Diaz? What he knew was what the stepfather had reported to 9-1-1, which is Tyler McDonald and Andy Diaz used to do drugs together and he was one of his drug buddies and he may be hiding out over at Andy's house, which was about a block away from the home. Now, he didn't have, Kelly did not have an arrest warrant, but they were looking for McDonald. Correct. They had... Why did they not have a warrant if they were looking for him? Well, first off, the call itself, plaintiff will characterize that as it was a call for help. It was a call to report that their son, who was wanted possibly on a warrant for a failure to appear on a wholly separate felony, had broken into their home. The 9-1-1 transcript conversation is in the record and it's clear that Mr. Whiteman says, Tyler was just in our house, he broke into our house. Whether the parents intended that to be a, they were calling for help, when the police respond to a 9-1-1 call, it's their job to determine whether or not there's probable cause to believe that a crime has been committed. So when the officers arrived at the Whiteman home, they were able to determine that they did in fact have probable cause to arrest Tyler for residential burglary, DV burglary that day. In addition, he was wanted for shooting his girlfriend four days earlier and a bolo had been issued for him. In addition, while Sergeant Kelly is reviewing the bolo that had been issued by Pierce County for Mr. McDonald's arrest for the shooting, a Pierce County deputy got on the radio and confirmed that they had independent probable cause for yet a third burglary. And the court is right. So I pursue this with Mr. Purser and that is if, if you skip over the Fourth Amendment privacy issue  and you have probable cause, then the next question which he raises is, well, you might have probable cause, but there really was no exigency. If there, or if there was an exigency, the timing is such that it was in effect a police manufactured exigency leading to a factual issue. What's your response to that? There are two issues there. With respect to there was no exigency,  Officer Sergeant Kelly asked Mr. Diaz, is he armed? And Diaz says, sir, I don't know. Who else is in the house? My nephew, who is a child? I think the district court summed it up beautifully. At that moment, Sergeant Kelly has two choices. He can withdraw and call SWAT and potentially create a hostage situation, or he can enter the home in an effort to take Mr. McDonald into custody before a hostage situation develops. They take issue with the fact that Mr. McDonald wasn't sitting in there holding a gun to the toddler's head. That's not the point, and that's not law enforcement's perspective. Law enforcement is required to make decisions based on the information that is available to them, their best judgment. Sergeant Kelly is standing there knowing that an individual who is desperate to avoid capture, who was known to have shot someone four days earlier and fled the scene with the gun in his hand, is in the house with a child. Am I wrong in thinking that at the time that the officer goes into the house, that isn't the nephew visible? No, that was another child. Mr. Diaz's toddler was sitting on the bed, so when he entered the room, he put himself between the door that led into the house and the child so that if Mr. McDonald came back into the bedroom... But there's a third person. But there's a third person in the house, correct. And with regard to the excess... Before I do that, I want to address the Billington issue, the Alexander and Billington issue. This is not an officer-provoked need for deadly force. The Billington, Alexander, Espinosa, Glenn cases, they do not apply here because there was not an independent constitutional violation. And their own expert characterizes the officer's pre-shooting conduct as negligent. Billington couldn't be any clearer. Negligence is not actionable. That's not going to get you there. You can disagree with the tactical decisions that the officer made prior to the shooting, but that disagreement, even negligent conduct, will not support the cause of action on that line of cases. With regard to the excessive force claim, the officer is in the house. Yes, there is a disputed question of fact. The district court correctly found it's not material. Mr. McDonald was in the house. He was... Hang on, so what time of day are we talking about? It is day. It was hot as blazes. So all of the windows were covered in the house. That's why the blanket was hanging in the sliding glass door. They were trying to keep the heat out. So it was very dimly lit. It was also a crowded house. And to put this into perspective, when Sergeant Kelly went through the Diaz bedroom and into the house, what he entered was the kitchen. I think the bedroom was probably a converted garage. Led into the kitchen. It's a galley-style kitchen with a pass-through window that looks into the living room. Is that diagram in the record? It is in the record. I couldn't find it, but just continue. I'll find it. It's actually on page 261. Okay, great. So he is looking through this pass-through window into the living room, and he can see an individual from neck to waist, but he can't see his hands. And the individual is wearing clothes that look like Tyler McDonald's. And the officer is giving him commands. He's shouting at him. Tyler, come on out. Show me your hands. Show me your hands. And Mr. McDonald is pacing. So as Mr. McDonald walks one way, the officer tracks him, and then Mr. McDonald comes back. But he's not complying with the officer's commands. What distance are we talking about between the officer and Mr. McDonald? Do we have some indication? Rough guesstimate, maybe 10 or 12 feet.  And then Mr. McDonald, who is breathing heavily and pacing, and by his own admission is agitated and is coming down off a three-day methamphetamine high. Well, he's trying to look for some way to get out. He is. He's desperate to get out. And then he comes around to what is the dining room area, and it is the entrance to the galley kitchen. And he brings, and we'll take the facts in the light most favorable to Mr. McDonald, brings his hands up with the dark object in his hand. So let me just see your imitation. You asked him the question. So what was he doing in the deposition? He basically, I said, I started bringing my hands up, and I'm starting to go down. Well, he brings his hand up. He's got a dark object in his right hand, which, by the way, he testified he only had in his hand because he didn't have pockets in his shorts. That's nonsense. He brought the hand up with the wallet, and in that split second, the officer believed, reasonably believed, that it was a gun, and he fired. A Fourth Amendment violation requires evidence that the officer's belief was unreasonable. Under these facts, there is no basis for that. The officer's mistaken belief does not give rise to a Fourth Amendment violation. Any officer in his position, when confronted with a suspect who was known to have been involved in a shooting, raising his hand with a dark object in it. What about, what if, what if there were a factual dispute as to the specific command that the officer gave right before Mr. McDonald raised his hands? If the officer said, show me your hands, or, you know, put your hands up, and that's precisely what Mr. McDonald did, and then he got shot. Wouldn't that give the jury? No. Drop the wallet. I mean, Mr. McDonald brought his hands up holding a dark object in his hand. If, in fact, the officer said, show me your hands, drop the wallet, and bring your hands up, he raised his hands. Again, the officer's belief that it was a gun was mistaken, but it was reasonable. And even if you were to decide that that wasn't reasonable, the officer's still entitled to qualified immunity. The Supreme Court has made it very, very clear. In order to deprive an officer of their qualified immunity, the case law doesn't have to be exactly on point, but it must leave no question that this particular conduct was unconstitutional. Judge McCowan, your analysis was absolutely correct. There is nothing which would have told, if we want to go back to the initial entry and Tyler's claim that that violated his Fourth Amendment rights, there was nothing which would have put Sergeant Kelly on notice. The entry into that house under these circumstances was violative of Mr. McDonald's rights. There is no case law cited, either by the district court or by the plaintiff, which would deprive the officer of his immunity on the issue of excessive force. The qualified immunity, the use of force analysis questions whether or not the officer's belief as to the necessity of the force was reasonable. The qualified immunity analysis questions whether the officer's belief as to the lawfulness of his conduct was reasonable. In this case, they were both reasonable. There's no violation. If there was, he'd still be entitled to immunity. I'd be happy to address municipal liability claims. I think they're appropriately briefed. If the court has any questions, I'm happy to answer them. Otherwise, the district court gave Mr. McDonald proper deference. He applied the standards on summary judgment as they are intended to be applied. He provided, the court provided a reasoned and thorough analysis and correctly decided that there were no material questions of fact and that the defendants were entitled to judgment as a matter of law. We would ask that the district court be affirmed in all respects. Thank you. Mr. Berger, I just have one question to clear up. What happened to the state law claims? Was it, it seemed that the district court didn't rule on them specifically, but you didn't appeal anything with respect to the state? We didn't, no. So, they're out the door? Yeah. Okay. The three areas I want to point to, Judge Goodwin, you asked questions regarding what did the officers know before they went there. The answer's not much. They really didn't know much. They got some information as they progressed. But again, that's why I think it's important to note that the whole event was three minutes or less than three minutes long and it's referenced in the CAD report. So, it is an extremely rapidly progressing matter. To say that he didn't, the Fourth Amendment law is clear that you cannot go into a home without a warrant unless you have an exception to that. I would urge that the exception does not apply. Any exception applies here. There just wasn't an exigency and you cannot create the exigency to go in there. The other part is on the application of force. I think the Glenn case is extremely important for purposes of considering this case because in the Glenn case, officers respond, the guy has a knife, he is surrounded by family members and is being instructed or the family members trying to instruct or tell the officers what's going on and they want to have nothing of it. And they are screaming and yelling and each time a new officer comes in there, it continues to get worse. They shoot him with the bean bags first and then as the bean bags are being shot, they also shoot him with the .40 caliber or whatever it was. That is a circumstance where it's comparable to Tyler's case because he is asked to do something and when he does what he's asked, he is shot. That is unreasonable under the circumstances and we respectfully urge that in addition to that claim but also the Fourth Amendment claim and the balance of the claims that the trial court urge and ask you to respectfully reverse this decision. Thank you. Thank you both for your argument this morning. The case of McDonald v. Tacoma is now submitted and we're adjourned for the morning.
judges: Goodwin, McKeown, Watford